UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHELLE M. SUVADA, ) | |
| ) | |
| Plaintiff, ) | No. 11 C 07892 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| GORDON FLESCH COMPANY, INC. ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michelle Suvada filed this lawsuit against her former employer, Gordon Flesch Company (GFC), alleging that GFC discriminated against her on the basis of disability in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Illinois Human Rights Act (IHRA), 775 ILCS 5/1-101 *et seq.*[1] R. 1, Compl. ¶¶ 1-2.[2] Specifically, Suvada alleges that GFC failed to provide her with a reasonable accommodation after learning Suvada had been diagnosed with cervical cancer, and the result was that GFC constructively discharged her from her job. *Id.* ¶¶ 26-37. GFC now moves for summary judgment on both the ADA and IHRA claims, R. 33, Mot. Summ. J, which is denied for the reasons explained below.

## I. Background

In evaluating the summary judgment motion, the Court views the facts in the light most favorable to the non-movant, Suvada. Michelle Suvada was hired by the

---

[1]The Court has subject matter jurisdiction over Suvada's federal claims under 28 U.S.C. § 1331 and her state-law IHRA claim under 28 U.S.C. § 1367.

[2]Citations to the docket are indicated by "R." followed by the docket entry.

Gordon Flesch Company as an "On-Site" Production Clerk in July 2009. R. 35, Def.'s Stmt. of Facts (DSOF) ¶ 8; R. 37, Pl.'s Resp. to Def.'s Stmt. of Facts (PSOF) ¶ 8. Among other things, GFC provides customers with printing and copying services at the customer's workplace, and GFC employees who work at the customer's workplace are "on-site." *See* PSOF ¶ 10. Suvada was assigned to work at the facility of Ennis Knupp & Associates, a GFC customer, and was supervised by Victoria Slouka, GFC's Administration and On-Site Operations Manager for the Chicago area. *Id.* ¶¶ 9, 12. Slouka, who worked out of her office in Geneva, Illinois, was in charge of administering all operations where GFC provided printing, copying, and related services to customer work-sites in the Chicago area. *Id.* ¶¶ 10-11. Part of Slouka's responsibilities included ensuring that on-site operations were fully staffed. *Id.* ¶ 14. At the Ennis Knupp site, full staffing ordinarily required two people, the On-Site Coordinator and the On-Site Production Clerk, but during production seasons when work was heavier, a third person—typically a temporary employee—would be added to the Ennis Knupp On-Site staff. *Id.* As the On-Site Production Clerk, Suvada worked alongside two other people at Ennis Knupp: Pierre Hill, the On-Site Coordinator, and John Ostendorf, the Operations Manager for Ennis Knupp, who was responsible for coordinating Suvada and Hill's activities. *Id.* ¶¶ 15-16.

At the time she was hired, Suvada received a binder of employee benefits information from Slouka, which included GFC's Employment Manual. *Id.* ¶ 17. Suvada reviewed the employee benefits information with GFC's Human Resources Department during her new-employee orientation program. *Id.* ¶¶ 18-19. There, she learned that

all full-time employees were covered under a short-term disability group insurance policy after the first 60 days of employment with the company. *Id.* ¶¶ 20-21. GFC employees were also given the option to participate in a long-term disability insurance program, which Suvada elected to do. *Id.* ¶¶ 20, 22. Instructions for how to file a disability claim under either of the disability policies were contained in the Employment Manual. *Id.* ¶ 24.

In September 2009, Suvada began experiencing medical issues and had to take time off work for doctor's appointments. *Id.* ¶¶ 25-27. All of these absences were excused by GFC, *id.* ¶ 28, though Suvada claims (and GFC denies, but on summary-judgment evaluation, that does not matter) that on September 28, when she informed Slouka of an upcoming doctor's appointment on October 8, Slouka expressed some concern over the amount of time Suvada had been taking off from work, and advised her to pay more attention to her job. R. 39, Pl.'s Stmt. of Add'l Facts (PSOAF) ¶ 8; R. 39-8, Pl.'s Exh. 8 (Suvada Decl.) ¶ 2. Slouka told Suvada that it would be easier if she scheduled her appointments earlier in the day because it was difficult to get coverage for Suvada's evening shifts when Suvada was expected to close. Suvada Decl. ¶ 2. As a result, Suvada rescheduled her appointment to October 8 so she could be at work later in the day. *Id.* Although she did not take Slouka's comment to be a "threat," she understood that her job would be at risk if she continued to take time off. *Id.*

Suvada learned that she had stage-four cervical cancer during the October 8 doctor's appointment. PSOF ¶¶ 31-32. Although her doctor placed no restrictions on Suvada's activities at that time, Suvada was scheduled to see an oncologist, who would

devise a cancer treatment plan for her. *Id.* ¶¶ 33-34. Shaken up by the news, Suvada returned to work the same day and told Pierre Hill (remember, he was the On-Site Coordinator) of her diagnosis. *Id.* ¶ 38. Later that afternoon, Hill emailed Slouka, informing her that he and John Ostendorf sent Suvada home for the day because she had just been diagnosed with cancer and clearly needed some time off. *Id.* ¶¶ 39-40. This was the first time that Slouka learned of Suvada's cancer. *Id.* ¶ 40.

The next day, on October 9, Slouka emailed the Ennis Knupp Print Shop (where both Suvada and Hill could be reached), asking if Suvada had come into work so she could make sure that Ennis Knupp was fully staffed. *Id.* ¶¶ 42-43. Suvada responded that she was there, but wanted to speak to Slouka over the lunch hour. *Id.* ¶ 44. Slouka and Suvada had a brief conversation, about 10 minutes long, at around 1:00 p.m., during which Suvada told Slouka that she had been diagnosed with cancer. *Id.* ¶¶ 45-46. Suvada said she had not seen a specialist yet and did not know what her treatment would be, but assumed that it would be a long road ahead and anticipated needing time to attend doctor's appointments. *Id.* ¶¶ 46-47. Suvada also expressed concern about the upcoming performance season, when the Print Shop would be busier. *Id.* ¶ 48. Suvada felt that it would be unfair to her co-workers to have to gear up for the performance season when she was unable to pull her weight, since she had been experiencing back pain and was having difficulty lifting boxes. R. 36-1, Def.'s Exh. A (Suvada Dep.) at 77:6-80:2. Although Suvada admits that Slouka never told her she was fired, *id.* at 85:15-17, Slouka did emphasize (according to Suvada) that Slouka "need[ed] someone during performance season," and pressed Suvada to tell her whether she would be able

4

to carry out her duties. PSOAF ¶ 12; Suvada Decl. ¶¶ 6-7. Slouka, however, denies making these statements. PSOAF ¶ 18. Indeed, during her deposition, Suvada did not testify about Slouka's insistence that she make a decision, even after confirming that she had related everything that she recalled about the October 9 phone conversation, Suvada Dep. at 103:2-5, and elsewhere in the deposition, Suvada described Slouka as an "awesome boss" who was "nothing but emphatic [sic] and wonderful during that phone conversation." Suvada Dep. at 85:4-9.

At the end of their conversation, Slouka asked if Suvada was giving her two weeks' resignation notice, but Suvada responded that she did not want to stop working. PSOAF ¶ 14. Instead, Suvada asked if Slouka knew of any easier jobs available at GFC, but Slouka said she did not know of any, and that all the jobs available in her division involved the same kind of work Suvada was doing at Ennis Knupp. PSOF ¶¶ 49-50. Slouka claims that she then referred Suvada to the GFC website where a complete listing of job openings could be found and instructed her to call the HR department with any questions. DSOF ¶ 51. Slouka testified that this was because it was GFC's policy not to have supervisors discuss an employee's personal or health information with the employee, but rather to have the employee speak directly to HR. PSOAF ¶ 20; R. 36-10, Def.'s Exh. H (Slouka Dep.) at 8:3-8. But Suvada has no memory of being referred to either the GFC website or HR, Suvada Dep. at 82:6-17, 83:21-84:7, and claims that she would have gone to the website to look for job openings if she had been told to do so. *Id.* at 87:20-88:2. As a result, Suvada never went to the GFC website to look for other job openings at GFC. *Id.* at 85:18-86:8, 87:20-88:2; PSOF ¶ 61. Nor did

she discuss with anyone from GFC the possibility of taking a leave of absence, or talk to HR about her cancer diagnosis or short-term disability benefits. PSOF ¶¶ 63-65.

After the phone conversation ended, Slouka called Andrew Popp of GFC's HR Department and told him of Suvada's condition, and that Suvada might be contacting HR. *Id.* ¶ 55. Slouka also contacted a temporary staffing agency to inquire about staffing a temporary employee at Ennis Knupp for the week of October 12. *Id.* ¶¶ 53-54. Then, at 1:28 p.m., less than 20 minutes after the Suvada-Slouka phone conversation had ended, Slouka received the following email from Suvada:

> Due to recent medical issues, I will be no longer capable of sufficiently fulfilling my duties at the location of Ennis Knupp and Associates under the employment of The Gordon Flesch Company. My last day of work for The Gordon Fles[c]h Company will be Friday, October 09, 2009. Thank you for the opportunity to have been under your employment.

*Id.* ¶56. Suvada explained that she decided to resign because she did not see any other options and felt that her resignation was the only way to avoid "screwing [her co-workers] over." Suvada Dep. at 101:2:18.

In November 2011, Suvada filed a three-count complaint against GFC, alleging violations of the ADA, IHRA, and ERISA. *See* Compl. GFC now moves for summary judgment on Suvada's ADA and IHRA claims, the ERISA claim having been voluntarily dismissed by Suvada.[3]

---

[3]Specifically, in her original complaint, Suvada also alleged that GFC violated sections 502 and 510 of the Employment Retirement Income and Security Act (ERISA), 29 U.S.C. §§ 1132 and 1140, *see* Compl. ¶ 3, but later voluntarily dismissed this claim. *See* R. 32, Aug. 29, 2012 Minute Entry. Thus, this opinion will only address her remaining ADA and IHRA claims.

## II. Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts, and any reasonable inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008) (citations omitted).

The evidence presented at the summary judgment stage must comport with the Federal Rules of Evidence and be admissible at trial, *see United States v. 5443 Suffield Terrance, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010), or else it must consist of affidavits or declarations "made on personal knowledge, set[ting] out facts that would be admissible in evidence, and show[ing] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A non-movant's own deposition testimony may alone be sufficient to create genuine issues of material fact and defeat a motion for summary judgment, if the party's testimony is based on personal knowledge or would otherwise be admissible at trial. *See Marr v. Bank of Am., N.A.*, 662 F.3d 963, 968 (7th Cir. 2011) ("[U]ncorroborated, self-serving testimony, if based on personal knowledge or firsthand experience, may prevent summary judgment against the non-moving party, as such testimony can be evidence of disputed material

7

facts." (internal quotation marks and citation omitted)). The Court may not assess the credibility of witnesses or weigh evidence, *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005), and will not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III. Suvada's Declaration

Before the Court can address Suvada's substantive claims, it must determine what facts it can consider for summary judgment purposes. GFC argues that the Court should disregard additional facts introduced in Suvada's Declaration, filed with her summary-judgment response, because they are inconsistent with Suvada's prior deposition testimony. R. 48, Def.'s Reply at 6-8. It is true that "as a general rule, a party may not create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony in the absence of newly-discovered evidence or the unmistakable need to clarify prior ambiguous statements." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 n. 5 (7th Cir. 2008) (citations omitted). But "[i]t is less obvious when . . . the 'new' statement adds to, without directly contradicting, prior testimony although the prior testimony is perfectly clear." *Id.* Indeed, it is well-settled that a party opposing summary judgment "may attempt to clarify or augment (but not contradict) prior deposition testimony through affidavits." *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir. 2002) (citation omitted).

Here, Suvada claims in her declaration that Slouka expressed concern over the amount of time Suvada had been missing from work for doctor's appointments and

warned Suvada to pay more attention to her job. R. 49, Def.'s Resp. to Pl.'s Stmt. of Add'l Facts (DSOAF) ¶¶ 7-8; *see also* Suvada Decl. ¶ 2. As a result of Slouka's request that Suvada schedule her appointments for earlier in the day, Suvada claims that she rescheduled one of her doctor's appointments so that she could be available in the evening to help with closing. Suvada Decl. ¶ 2. Suvada stated that although she did not take Slouka's statements to be a "threat," she understood that her job would be at risk if she continued to take time off. *Id.* These facts will be disregarded for summary judgment purposes, since they are in direct contradiction to Suvada's deposition testimony that she was "never reprimanded by [Slouka] or anybody with the Gordon Flesch Company for taking . . . time off to attend [her] medical appointments." Suvada Dep. at 68:3-7.

Suvada also asserts in her declaration that during their October 9 phone conversation, Slouka told her that "there were no alternative jobs and gave [her] no other options." Suvada Decl. ¶ 8. But in her deposition, Suvada testified that Slouka only told her that "she didn't know of any [jobs]," Suvada Dep. at 82:10-12, which Suvada interpreted it to mean that "[Slouka] did not have any openings . . . *within her area.*" *Id.* at 179:4-13 (emphasis added). It would be a direct contradiction for Suvada to expand her testimony now and claim that Slouka told her there were no other available jobs *at all* at GFC, so this part of Suvada's declaration must also be disregarded.

In contrast, Suvada's statements that Slouka pushed her to make a decision on whether she could be available for the upcoming performance season, Suvada Decl. ¶¶

6-7, and that Suvada felt that she would be terminated if she did not resign, *id.* ¶ 8, will be considered in evaluating the summary-judgment motion. These statements do not contradict her prior deposition testimony, and thus may properly be considered for summary judgment purposes.[4] All other statements made in Suvada's declaration—aside from the statements regarding Slouka's "warning" and her comment that there were no alternative jobs—may also be considered for summary judgment.

## IV. ADA Claim

The Court now turns to Suvada's substantive claims. First up is Suvada's ADA claim. Suvada alleges that GFC violated its obligations under the ADA by (1) failing to engage in the interactive process and provide a reasonable accommodation of her disability; and (2) constructively discharging her from employment. Compl. ¶¶ 26-37. The Court will address each of these in turn.

### A. Failure to Accommodate

GFC contends that summary judgment is warranted on Suvada's failure-to-accommodate claim because Suvada voluntarily resigned her employment before she

---

[4]Although the statements are fair game for Suvada to introduce for the summary-judgment evaluation, GFC will be entitled to impeach Suvada at trial by introducing her deposition testimony, where she did not testify that Slouka pushed her to make a decision regarding the performance season. It is one thing for a declaration's statement to not be *directly* contradictory—and thus can be considered for summary-judgment evaluation—but that does not mean that there is no impeachment value to the omission of the statement from the deposition. Specifically, at her deposition, Suvada testified that she had related everything that she remembered about the October 9 phone conversation, Suvada Dep. at 103:2-5, and that Slouka was an "awesome boss" who was "nothing but emphatic [sic] and wonderful during that phone conversation." Suvada Dep. at 85:4-9. At trial, GFC can impeach by omission (using the former statement) and by contradiction (using the latter statement), and the jury will decide the witnesses' credibility, including possibly rejecting Suvada's version of the facts. But at the summary-judgment stage, the Court cannot pick the credibility winner.

informed GFC of her accommodation needs and before the parties could engage in any meaningful interactive process. R. 34, Def.'s Br. at 5. Under the ADA, an employer must make "reasonable accommodations" to a disabled employee's limitations, unless the employer can demonstrate that to do so would impose an "undue hardship." 42 U.S.C. § 12112(b)(5)(A). Failure to make reasonable accommodations for a known disability constitutes unlawful discrimination. 42 U.S.C. §§ 12112(b)(5)(A), 12112(a). To prevail on a failure to accommodate claim, "a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005) (citation omitted).

Here, both parties assume for the purposes of this motion that the first two elements have been satisfied. Def.'s Br. at 6; R. 41, Pl.'s Resp. Br. at 2. Thus, only the third element is at issue: whether GFC failed to reasonably accommodate Suvada's disability. It is not always obvious what limitations a disability might impose, what accommodations are available, and what accommodations are reasonable. So, under the ADA, an employee begins the accommodation "process" by informing his employer of his disability. *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996). "Once an employer's responsibility to provide reasonable accommodation is triggered, the employer must engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996) (citations omitted). This requires the employer to engage in a flexible, interactive process with the disabled

11

employee needing accommodation so that, together, they can identify the employee's precise limitations and discuss accommodations that might enable the employee to continue working. *See* 29 C.F.R. § 1630.2(o)(3).

The threshold question is whether Suvada successfully triggered GFC's duty to engage in the interactive process. GFC suggests in its opening brief that Suvada did not trigger its duty to accommodate because at the time Suvada told Slouka of her diagnosis, she had no treatment plan, was not subject to any medical restrictions, and did not mention what type of cancer she had. Def.'s Br. at 6. Therefore, the Defendant's argument goes, GFC could not have engaged in any meaningful interactive process because Suvada had not informed GFC of her purported accommodation needs. *See id.* at 5. But the law requires very little of the employee to trigger the employer's duty to engage in the interactive process; all that is required is that the employee notify the employer of her disability. *Sears*, 417 F.3d at 803-04 (citations omitted). Here, Suvada told Slouka that she had been diagnosed with cancer, PSOF ¶ 46, which is enough to put GFC on notice of Suvada's disability and ask follow-up questions. But Suvada did more than just notify Slouka of her disability; she also asked for an accommodation, and asked if there were any easier jobs available. PSOF ¶ 49. To be sure, Suvada admits that she did not identify, in this 10-minute conversation, her request with precision: "[she] didn't know what [she] was supposed to be asking," Suvada Dep. at 89:12-19, and that by asking for an easier job, she "didn't know what [she] was looking for in a job. . . . maybe what [she] meant by easier was something that didn't involve the heavy lifting and stuff that could, in the future, upset [the cancer]. . . . Maybe a

12

desk job or a filing, something that [she] could probably have just dealt with it a little bit better than not being able to perform [her] duties." *Id.* 96:15-97:5. That Suvada did not specify what type of job she desired does *not* mean, however, that she failed to trigger the interactive process, and does not absolve GFC of asking further questions to search for a reasonable accommodation. *Sears*, 417 F.3d at 804 (employee need not explicitly request an accommodation or specifically identify a particular accommodation). "[A]n employer cannot expect an employee to . . . know that he or she must specifically say 'I want a reasonable accommodation.'" *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996). So, when Suvada properly notified GFC of her disability, Suvada triggered GFC's duty to engage in the interactive process.

The next question is whether GFC successfully discharged this duty, and if not, whether GFC was responsible for the breakdown in the interactive process. If an employee shows that her disability was not reasonably accommodated because of a breakdown in the interactive process, the key question is who bears responsibility for the breakdown. *See Beck*, 75 F.3d at 1137. In determining who is responsible for a breakdown, courts look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. *Id.* at 1135. A party that obstructs or delays the interactive process is not acting in good faith. *Id.* Similarly, a party that fails to communicate, by way of initiation or response, might also be acting in bad faith. *Id.* Sometimes the cause of the breakdown is missing information. In that situation, if the

13

missing information "is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process." *Id.* at 1136. This determination must be made in light of the circumstances of each case. *Id.*

Here, Suvada told Slouka that she was having difficulty lifting, and expressed concern that her co-workers would be left to gear up for the upcoming performance season without her pulling her own weight. Suvada Dep.77:6-80:2. She asked if Slouka knew of any easier jobs available at GFC. PSOF ¶ 49. Slouka told her that she did not know of any easier jobs because all the jobs in her division were mail-room and print-shop positions that entailed the same kind of work. PSOF ¶ 50. But according to Suvada, that was as far as the interactive process went: Slouka did not tell her to check the GFC website for a comprehensive list of job openings or contact the HR Department to inquire about other job listings. PSOAF ¶¶ 15-16. Instead, Slouka emphasized that she "need[ed] someone during the performance season," and pressed Suvada to tell her whether she would be able to do it. *Id.* ¶ 12; Suvada Decl. ¶ 6. Then, at the end of her conversation, Slouka outright asked Suvada if she was giving her two weeks' resignation notice, but Suvada insisted that "she didn't want to stop working." PSOAF ¶ 14. This should have been enough to prompt GFC to consider whether there was a reasonable way to accommodate Suvada's limitations in her then-current job, or whether Suvada could be reassigned to a position that she would have been able to perform. *See Miller v. Ill. Dep't of Corr.*, 107 F.3d 483, 486-87 (7th Cir. 1997) ("Even if an employee . . . just says to the employer, 'I want to keep working for you—do you

14

have any suggestions?' the employer has a duty under the [ADA] to ascertain whether he has some job that the employee might be able to fill." (citations omitted)). This is because the ADA requires an employer to consider reassignment as one form of accommodation if the employee is unable to perform his job. *See* 42 U.S.C. § 12111(9)(B). If a vacant position is available and the disabled employee is qualified for it, "the ADA may require an employer to reassign [him] . . . as reasonable accommodation." *Gile v. United Airlines, Inc.*, 95 F.3d 492, 498 (7th Cir. 1996). But an employer's duty to reassign a disabled employee has limits: The employer need only transfer the employee to a position for which the employee is otherwise qualified. *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 913 (7th Cir. 1996) (citation omitted); *Gile*, 95 F.3d at 499 (citation omitted). Moreover, the employer is only obligated to assign an employer to vacant positions, and is not required to "bump" other employees to create such a vacancy. *Gile*, 95 F.3d at 499 (citation omitted). Nor is the employer required to create a brand new position for the disabled employee. *Id.* (citation omitted).

But here, according to Suvada, Slouka did nothing to provide Suvada with further information on what other jobs were available at GFC. Suvada needed direction from Slouka on what her options were, and Slouka failed to provide adequate guidance. *See* Suvada Dep. at 185:20-23 ("I just needed more of a direction. What can be done, hey, why don't you talk to HR, something along those lines, and that didn't even happen."). As a result, Suvada never went to the GFC website or talked to anyone in HR to discuss other job openings at GFC. PSOF ¶¶ 61, 63-65. Seeing no other options, Suvada resigned. PSOAF ¶ 17. GFC presents some evidence that Slouka did in fact

15

refer Suvada to both the GFC website and the HR Department, DSOF ¶ 51, and argues that GFC cannot be responsible for the breakdown in the interactive process because Suvada voluntarily quit. Def.'s Br. at 6-10. But at this stage of the litigation, the Court must view the evidence in the light most favorable to Suvada and draw all reasonable inferences in her favor. *Shannon*, 539 F.3d at 756 (citation omitted). And, under Suvada's version of the story, this was a situation where the interactive process broke down because missing information—namely, information about alternative jobs at GFC—was withheld from the employee. *See Beck*, 75 F.3d at 1136. In light of all this, and viewing the evidence in Suvada's favor, there is a genuine issue of material fact as to whether Slouka obstructed the interactive process by withholding information about alternative job openings, and a reasonable jury could conclude that GFC was responsible for the breakdown in the interactive process.

GFC also contends that it cannot be responsible for causing the breakdown in the interactive process because, based on the orientation training Suvada received in June 2009, Suvada knew that internal job postings were posted on GFC's website. Def.'s Br. at 7; DSOF ¶ 60. But whether Suvada knew about the resources available to her on GFC's website does not absolve GFC of its duty to engage in the interactive process. The ADA imposes an *affirmative* duty on employers to make reasonable accommodations for disabilities of an employee who can perform the essential functions of her job with or without accommodation. *Feldman v. Am. Mem'l Life Ins. Co.*, 196 F.3d 783, 789 (7th Cir. 1999) (citation omitted). Thus, GFC cannot simply rely on the employment manual or the employee's training, provided around four months before

Suvada learned of her cancer and before the start of the interactive process, to satisfy its duty to provide a reasonable accommodation.

It bears noting that, although the Court is denying summary judgment on Suvada's accommodation claim, Suvada will still have to prove at trial that a reasonable accommodation was actually available. This is because a failure to engage in the interactive process by itself does not give rise to relief under the ADA. *Rehling v. City of Chicago*, 207 F.3d 1009, 1015-16 (7th Cir. 2000). The plaintiff must show that a reasonable accommodation existed, and that the employer's failure to engage in the interactive process resulted in a failure to accommodate. *See id.* at 1014-15. Ordinarily, courts first look at whether there is a genuine issue of material fact regarding the availability of a reasonable accommodation, and if it is clear that no reasonable accommodation was available, the analysis stops there. *See Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001). But here, GFC contended that the availability of a potential accommodation was immaterial to its summary judgment motion, and merely noted (literally, in a footnote) that the evidence would show that no easier jobs were available at the time. Def.'s Br. at 7 n. 3. Because GFC never made, in summary-judgment briefing, the argument that Suvada failed to prove the actual existence of a reasonable accommodation, Suvada in turn never responded to it. Thus, for purposes of this summary-judgment motion, the absence of evidence on whether an actual accommodation existed does not affect the analysis now. But at trial, Suvada will be required to prove that an actual accommodation existed, and that GFC's failure to engage in the interactive process deprived her of a reasonable accommodation.

17

## B. Constructive Discharge

GFC next contends that summary judgment is warranted on Suvada's constructive discharge claim because a reasonable employee would not have interpreted Suvada's exchange with Slouka to mean that she was about to be fired. Def.'s Reply at 11. The ADA prohibits an employer from taking adverse employment actions against an employee on the basis of disability. 42 U.S.C. § 12112(b)(1)-(7); *Feldman*, 196 F.3d at 789 (citation omitted). Although the Seventh Circuit has yet to determine "whether a claim of constructive discharge stemming from a hostile work environment is cognizable under the ADA," courts have generally assumed that the claim does exist,[5] *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 440 (7th Cir. 2000) (citations omitted), and have analyzed ADA constructive discharge claims using the same standards applied to analogous claims brought under Title VII. *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1017 (7th Cir. 1996) (citation omitted).

To establish a claim for constructive discharge under Title VII, a plaintiff must show that (1) she was constructively discharged—that is, her working conditions were so intolerable that a reasonable person would have been compelled to resign; and (2) the constructive discharge was motivated by discriminatory intent. *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 877 (7th Cir. 1999) (citations omitted); *see also EEOC*

---

[5]Because GFC does not argue that a constructive discharge claim does not exist under the ADA, that argument is waived and the Court will join in that assumption. *McCready v. Title Servs. of Ill., Inc.*, 2008 WL 2435933, at *3 (N.D. Ill. June 16, 2008) ("When a party fails to address an argument in his summary judgment brief, it is deemed a waiver." (citations omitted)); *see also Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 876 (7th Cir. 2008) (undeveloped argument constitutes waiver).

*v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002). Constructive discharge can take two different forms: under the first form, an employee resigns due to alleged discriminatory harassment, harassment so intolerable that a reasonable person would have no choice but to quit. *Univ. of Chicago Hosps.*, 276 F.3d at 331 (citations omitted). Under this approach, a plaintiff must demonstrate a harassing work environment that is "even more egregious than the high standard for hostile work environment." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) (citation omitted). But Suvada does not assert that she was subject to discriminatory harassment. Rather, Suvada contends that the second form of constructive discharge is more fitting to her claim, Pl.'s Resp. Br. at 11, namely, "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge." *Univ. of Chicago Hosps.*, 276 F.3d at 332 (citations omitted). In other words, constructive discharge occurs where, based on an employer's actions, "'the handwriting [was] on the wall' and the axe was about to fall." *Id.* (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998)). One example of this second form of constructive discharge is the boss handing an already-typed resignation letter to an employee, accompanied by the warning, "You can sign this resignation letter or be fired." *See Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 494, 502 (7th Cir. 2010).

In evaluating Suvada's constructive discharge claim, the key inquiry is whether a reasonable employee in Suvada's position would have understood her October 9, 2009 phone conversation with Slouka to mean that she had to resign, and if she did not, she

19

would be terminated. *Univ. of Chicago Hosps.*, 276 F.3d at 332. Here, Suvada claims that when she called Slouka on that day, Suvada was anxious about how she was going to manage her workload and medical appointments and was looking for direction from Slouka. PSOAF ¶ 10. Although Slouka never told her she was fired, Suvada Dep. at 85:15-17, Slouka emphasized that she "need[ed] someone during performance season," and pressed Suvada to tell her whether she would be able to carry out her duties. PSOAF ¶ 12; Suvada Decl. ¶ 6. Suvada also asked Slouka if she knew of any easier jobs available, but Slouka said she did not know of any. PSOF ¶¶ 49-50. Slouka asked Suvada if she was giving her two weeks' notice, but Suvada responded that she did not want to stop working. PSOAF ¶ 14. Slouka then told her that if she was going to resign, Slouka "would need her resignation in writing." *Id.* ¶ 17. By the end of the conversation, Suvada felt that her choices were to resign or be terminated. *Id.* Suvada thus emailed a written resignation letter to Slouka shortly after their phone conversation ended. PSOF ¶ 56.

Were this a non-ADA constructive discharge claim brought under Title VII (unless it was a religious-discrimination case, as noted below), Suvada's claim would not be able to withstand summary judgment. This is because courts have set a high standard for what types of employer actions are so intolerable (or so clearly a resign-or-be-fired warning) as to justify an employee's resignation and effect a constructive discharge. *Compare Kodish*, 604 F.3d at 494, 502 (employee constructively discharged where employer handed him a letter of resignation and informed him that he could resign or be terminated immediately)*, and Univ. of Chicago Hosps.*, 276 F.3d at 332-33

(holding that a reasonable employee standing in the plaintiff employee's shoes could have believed that she would be terminated if she did not resign, where the employee returned from vacation to find her belongings packed and her office being used for storage), *with Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 680-81 (7th Cir. 2010) (car salesman not constructively discharged where employer threatened discharge but later actively encouraged salesman to return to work, and salesman never returned to work but acknowledged he was still employed), *and Fischer v. Avanade, Inc.*, 519 F.3d 393, 410-11 (7th Cir. 2008) (no constructive discharge where employer asked derisive questions about employee's motives for filing an EEOC claim, audited employee's expenses, gave a negative performance assessment, and required employee to either move to maintain her current position or transfer to a different position). Under the Title VII line of cases, no reasonable employee in Suvada's position would have interpreted her supervisor's statements that there were no easier jobs available in her *division* to mean that there were *no* jobs available at GFC and that she would be terminated if she did not resign—even when considered in conjunction with Slouka's questions asking, "Are you going to be able to do [the performance season]? I'm going to need to know. You need to let me know." Suvada Decl. ¶ 6. The evidence is insufficient to convince a reasonable jury that the "handwriting was on the wall" and that Suvada quit "just ahead of the fall of the axe." *Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998).

But this is not a Title VII case. This is a disability discrimination case under the ADA, which imposes an affirmative duty on employers to provide a reasonable

21

accommodation. *Feldman*, 196 F.3d at 789 (citation omitted). Generally speaking, there are no affirmative duties for employers to act under the federal employment discrimination statutes, but the law demands more of employers in the disability- and religious-discrimination contexts. *See id.*; *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1574 (7th Cir. 1997) (citing 42 U.S.C. § 2000e(j)). Indeed, the ADA and Title VII's provisions for religious discrimination both require employers to reasonably accommodate employees' disabilities and religious observances. 42 U.S.C. § 12112(b)(5)(A); 42 U.S.C. § 2000e(j). In these types of cases, the employer has a heightened duty to engage the employee in the interactive process to identify a reasonable accommodation. *See, e.g.*, *EEOC v. AutoNation USA Corp.*, 52 F. App'x 327, 329 (9th Cir. 2002) (discussing employer's duty to engage in interactive process in a religious-discrimination case); *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000) (same). Thus, when considering a constructive discharge claim brought under the ADA, the Court must evaluate the reasonableness of the employee's response with this heightened duty in mind. Because an employer must do more to see if an accommodation can be made for an employee with a disability, the standard for reasonableness must be correspondingly more forgiving for an employee bringing an ADA-based constructive discharge claim. To hold otherwise would undermine the interactive-process requirement demanded by the ADA.

Here, as discussed above, the interactive process broke down because in response to Suvada's request for an accommodation, Slouka simply said there were no easier jobs that she knew of in her division, and then pressed her to make a decision

22

about whether she could work during the performance season. The record evidence, when viewed in the light most favorable to Suvada, shows that, given GFC's heightened duty to accommodate Suvada's disability, it was reasonable for Suvada to infer from that exchange that she had no future at GFC. At that point, the interactive process had broken down, and, as far as Suvada knew, there were no other jobs available for her. Accordingly, there is a genuine issue of material fact as to whether Suvada was constructively discharged. The unique protections afforded by the ADA require that, at this stage of the litigation, Suvada's constructive discharge claim be allowed to move forward. All in all, then, GFC's motion for summary judgment on Suvada's ADA claim—under both the failure to accommodate and constructive discharge theories—is denied.

## V. IHRA Claim

Suvada alleges a separate claim for disability discrimination under the IHRA, 775 ILCS 5/1-101 *et seq.* Compl. ¶¶ 38-50. Like the ADA, the IHRA prohibits employment discrimination based on a person's disability. *See* 775 ILCS 5/2-102(A). "When analyzing claims of discrimination under the [IHRA], Illinois courts have looked to the standards applicable to analogous federal claims." *Luckett v. Human Rights Comm'n*, 569 N.E.2d 6, 14 (Ill. App. Ct. 1989) (citation omitted); *see also De v. City of Chicago*, 912 F. Supp. 2d 709, 733 (N.D. Ill. 2012) (citation omitted). Accordingly, if the record evidence cannot support summary judgment on her ADA claim, then summary judgment must also be denied on her state-law IHRA claim. *See Terrugi v. CIT*

*Group/Capital Fin., Inc.*, 2012 WL 1570770, at *5 (N.D. Ill. May 3, 2012) (citations omitted).

Here, as explained above, the Court concludes that there are genuine issues of material fact that allow Suvada's ADA claim to move forward. And, because the same standards apply in evaluating her IHRA claim, *Luckett*, 569 N.E.2d at 14, so too, is summary judgment denied on the IHRA claim.

## VI. Conclusion

For the reasons stated above, GFC's motion for summary judgment [R. 33] is denied. At this stage of the litigation, Suvada has presented sufficient evidence to create a genuine issue of material fact on both her ADA and IHRA claims. Once again, however, it bears saying that the ruling today is based on the presumption that Suvada's version of the facts are true, with all reasonable inferences drawn in her favor. At trial, Suvada will have to face impeachment based on her deposition testimony—namely, that she had related everything that she recalled regarding her October 9 phone conversation with Slouka, Suvada Dep. at 103:2-5, and that Slouka was an "awesome boss," and was "nothing but emphatic [sic] and wonderful during that phone conversation." *Id.* at 85:4-9. The jury might not accept Suvada's version, and she will bear the burden of proof. At the next status hearing, the parties must be ready to

say whether they want to hold a settlement conference, and if so, whether they have

a preference (or not) to hold it with the Court or with the magistrate judge.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 13, 2013